UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT F. COLON,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>DR. PETERSON, et al.,<br><br>　　　　　Defendants | Case No. 1:07 cv 00932 AWI GSA PC<br><br>FINDINGS AND RECOMMENDATION RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF NO. 74)<br><br>OBJECTIONS DUE IN THIRTY DAYS |

　　　　Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This proceeding was referred to this court by Local Rule 302 pursuant to 28 U.S.C. § 636(b)(1).   Pending before the Court is Defendants' motion for summary judgment.  Plaintiff has opposed the motion.[1]

**I.　　Procedural History**

　　　　This action proceeds on the June 5, 2008, first amended complaint.  Plaintiff, currently housed at Folsom State Prison, brings this action against correctional officials employed by the California Department of Corrections and Rehabilitation (CDCR) at the Sierra Conservation Center at Jamestown (SCC).  The events at issue occurred while Plaintiff was housed at SCC.

---

[1] Defendants' motion for summary judgment was filed on September 15, 2011 (ECF No. 74).  On July 10, 2012, the Court issued and re-served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988)(ECF No. 92).  The order was re-served in response to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

1

Plaintiff alleges an Eighth Amendment violation for inadequate medical care. Plaintiff names as Defendants Dr. Peterson, Dr. St. Clair, Dr. Thomatos, Dr. Witwer, Dr. Greenough, Dr. Sydenstricker, Dt. Stogsdill, Correctional Officer (C/O) Porter, and N. Grannis, Chief Inmate Appeals Branch Officer. On May 27, 2009, an order was entered by the District Court, dismissing Plaintiff's claims against Defendants Porter, Grannis, Stogsdill, and St. Clair, with prejudice. Defendant Thomatos filed an answer on November 18, 2009. Defendants Sydenstricker and Witwer filed an answer on June 1, 2010. Defendant Peterson filed an answer on October 25, 2010. On February 10, 2011, an order was entered, dismissing Defendant Greenough pursuant to Federal Rule of Civil Procedure 41 on Plaintiff's motion. Defendants Thomatos, Sydenstricker, Peterson and Witwer filed the motion for summary judgment that is now before the Court. Plaintiff has opposed the motion.

## II.     Allegations

Plaintiff alleges generally that he did not receive adequate medical care while housed at SCC. Plaintiff suffers from chronic pain in his neck and elbow, sinus bleeding, difficulty swallowing with coughing and neck muscle weakness. Plaintiff alleges that he was prescribed Neurontin, which, in Plaintiff's view, is not a pain medication.

### A.     Dr. Peterson

Plaintiff's allegations regarding Dr. Peterson follow:

> Dr. Peterson did willfully and purposely delay medical care by not ordering proper tests (MRI, x-rays, blood work, etc.) or effective pain medication and/or treatment to investigate and reduce suffering and pain of Gilbert Francis Colon prior to medical complaint that was submitted and even after such. . . . Dr. Peterson submitted a routine CDC Form 7232 Physician's Request For Medical Services on April 5, 2005 that actually involved getting a MRI taken on the Plaintiff's cervical spine. From Dec. of 2002 to the date of April 5th, 2005, it was approximately (3) years. From actual documentation on which the Directors Level on appeal had based their determination and decision on, this is when Dr. Peterson Finally ordered an MRI to investigate the plaintiff's medical problem. The plaintiff was complaining about pain and discomfort all along, so why had it taken so long for Dr. Peterson to investigate this medical problem? Also, Gilbert F. Colon had continuously and constantly requested pain medication for his pain

2

> from Dr. Peterson, and all Dr. Peterson did was upgrade the doses of Neurontin which the plaintiff on many occasions requested other medication because he indicated that the medications that were given, were not working any longer, but he was denied! Also on May 4, 2005, it states (in the Directors Level), that Dr. Peterson evaluated the plaintiff of neck pain, etc. The doctor diagnosed Gilbert F. Colon with 'degenerative disc disease' of the neck and prescribed pain medications, which again was Neurontin which actually is not a pain medication!
>
> Now again on May 5, 2005, x-rays of the cervical spine were obtained. On June 8, 2005, Dr. Peterson re-evaluated the plaintiff (Gilbert F. Colon) during a scheduled follow-up appointment. Dr. Peterson informed the plaintiff that he had degenerative disc disease and/or anterior spondycolisthesis (displacement of vertebra) at the C-4 level. The Dr. requested a repeat MRI of the cervical spine and indicated that Gilbert F. Colon would be seen in 7 days. Gilbert was never seen until August 1, 2005, by Dr. Thomatos.

(Am. Compl. 1:27-3:5).

    **B.**    <u>**Dr. Thomatos**</u>

Regarding Dr. Thomatos, Plaintiff alleges the following:

> The plaintiff actually believes, that Dr. Thomatos fabricated her written doctor's report at the time she wrote it as to what she observed as for movement in regards to plaintiffs injuries. On January 23, 2006, it states that Dr. Thomatos evaluated the appellant regarding his appeal issues. It states that the plaintiff had full movement on all aspects as written by the doctor. Obviously the truth in this matter was somewhat stretched out by Dr. Thomatos. Prior medical reports, x-rays, MRIs, etc., do indicate that there is a medical problem concerning these areas of the plaintiff's body. That within itself would in fact cause limited movement, regardless of what was written by Dr. Thomatos.

(Am. Compl. 3:20-4:3).

    **C.**    <u>**Dr. Sydenstricker**</u>

Regarding Dr. Sydenstricker, Plaintiff alleges the following:

> Defendant Sydentstricker maliciously and purposely denied plaintiff Gilbert Francis Colon effective proper treatment and medication while perfectly knowing and realizing the severity of pain that the plaintiff was experiencing during a follow up examination and review of a cervical spine x-ray taken in regards to plaintiff's neck and lower back medical condition.
>
> On approximately the date of 1-7-04, Dr. Sydenstricker and plaintiff were discussing the medical condition and results of an x-

3

> ray that was obtained from a doctors order that was actually written and submitted by Dr. Sydenstricker at a previous medical appointment.  At this particular time, Dr. Sydenstricker examined the plaintiff, and while examining Gilbert F. Colon, there was obvious discomfort and limited movement due to the medical condition.  Now after the completion of the examination, Dr. Sydenstricker indicated to the plaintiff that he would only prescribe Gilbert Tylenol or Ibuprofen and Methocarbamol (Robaxin) and nothing else since he did not believe that he was in as much pain as he addressed.  At this point a disagreement of words ensued between the plaintiff and the doctor, and this is when Dr. Sydenstricker had actually told the plaintiff to leave his office which he did.
>
> Prior to this particular appointment, the plaintiff had complained of this medical condition to this doctor approximately 2 to 3 times before at previous appointment.  This physician did not show any sort of medical concern or interest at those previous times, nor did he show any interest or caring at this time addressed as well.

(Am. Compl. 8:22-9:19.)

       **D.**     **Dr. Witwer**

> Regarding Dr. Witwer, Plaintiff alleges the following:
>
> Dr. Witwer purposely and intentionally avoided investigating the medical condition, problem and pain that I (Gilbert Francis Colon) was experiencing at the time of this examination.  His observations were very "quick" and did not even examine the painful areas with hands on.
>
> On the Directors Level (page 3) of the first level response, it states that on Dec 15th, 2005, Dr. Witwer evaluated the plaintiff.  Dr. Witwer noted that the plaintiff Gilbert F. Colon had on going neck ache despite of minimal abnormalities.  Dr. Witwer did not examine the plaintiff good enough to even determine what was, or, what wasn't minimal abnormalities.  Abnormalities are abnormalities and that's not normal!  Dr. Witwer should have examined the plaintiff thoroughly but failed to do so.  Also, Dr. Witwer prescribed Parafon Forte (Chlorzoxazone) which is in fact for relief of acute painful musculoskeletal conditions.  If the doctor actually did examine the plaintiff as he was suppose to do, and also read the doctors reports that were written previously from other physicians as well as x-rays, MRIs, etc, he would have seen for himself that this medication and symptom did not fit what he actually prescribed for his patient.

(Am. Compl. 4:7-26.)

4

### III.  Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.
>
> Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denial of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to

5

see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985)(aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### IV. Medical Care

Under the Eighth Amendment, the government has an obligation to provide medical care to those who are incarcerated. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000). "In order to violate the Eighth Amendment proscription against cruel and unusual punishment, there must be a 'deliberate indifference to serious medical needs of prisoners.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97. 104 (1976)). Lopez takes a two-prong approach to evaluating whether medical care, or lack thereof, rises to the level of "deliberate indifference." First, a court must examine whether the plaintiff's medical needs were serious. See Id. Second, a court must determine whether "officials intentionally interfered with [the plaintiff's] medical treatment." Id. at 1132.

Defendants support their motion with the declaration of Dr. Thomatos, and copies of relevant portions of Plaintiff's medical record. Regarding Plaintiff's care, Dr. Thomatos declares the following:

> I have been a medical doctor at Sierra Conservation Center (SCC) from 2003 to the present.
>
> I have reviewed the relevant CDCR records for plaintiff, GILBERT COLON from the time of his incarceration at SCC State Prison. The record reflects that plaintiff was seen by many other physicians and other health care providers at SCC, other prisons, and outside medical providers during his incarceration. Doctors do not determine which patients they see or when.
>
> On 1/5/2004 plaintiff was prescribed Robaxin 750 mg and Motrin 600 mg for his acute muscle pain.
>
> On 1/7/2004 Dr. SYDENSTRICKER ordered an x-ray of the plaintiff's cervical spine. The findings were that there was narrowing of three discs in his lower cervical spine. The impression was that he had lower cervical spondylothesis. Plaintiff was also prescribed 750 mg of Robaxin, 600 mg of Motrin, and 60 mg of Toradol for his pain.
>
> On 3/24/2004 plaintiff was prescribed Parafon Forte 500 mg and Tylenol 500 mg.
>
> Plaintiff obtained an MRI of his cervical spine on 4/15/2004. The MRI demonstrated that the alignment of the plaintiff's cervical spine was normal. He had normal amounts of bone marrow with minimal and moderate narrowing. It also showed an absence of focal disc herniation. The resultant diagnosis was minimal degenerative disc disease.
>
> Degenerative disc disease is a very common condition that affects many people as they age. Minimal degenerative disc disease is the lowest gradation. It is treated with pain medication, muscle relaxants, and anti-inflammatory drugs. Surgery is not necessary or advisable.
>
> Spondylothesis is the subtle movement of discs or the forward shift of a vertebrae. It is also common with aging. It is often treated with physical therapy exercises and medication that begins low and increases incrementally to effectively manage the patient's pain. Doctors do not normally prescribe heavy narcotics and opiates for either minimal degenerative disc disease or spondylothesis.
>
> On 5/24/2004 Dr. Parkinson ordered an x-ray of plaintiff's lower back and noticed a slight degeneration of the disc between the L5 and S1 vertebrae.

7

On 5/10/2004 I prescribed plaintiff 600 mg of Neurontin and 750 mg of Robaxin.

On 5/24/2004 Dr. Parkinson refilled plaintiff's prescription of Robaxin, he was also prescribed 500 mg of Tylenol and started on 400 mg of Neurontin.

On 9/27/2004 Dr. Parkinson prescribed 500 mg of Tylenol and 500 mg of Parafon Forte. He also advised stretching exercises.

On 10/19/2004 plaintiff told Dr. Parkinson that he had taken Neurontin in the past, but could not remember whether it was helpful.

On 11/23/2004 Dr. SYTDENSTRICKER prescribed plaintiff 600 mg of Neurontin and 500 mg of Tylenol to treat his acute neck pain.

On 12/23/2004 I prescribed plaintiff 600 mg of Neurontin, 500 mg of Tylenol, and 500 mg of Robaxin. These medications were prescribed to treat plaintiff's complaints of pain in his back. During that meeting plaintiff expressed to me that these medications helped in treating his pain.

The records reflect that as of January, 2005 plaintiff was prescribed 600 mg of Neurontin.

The records reflect that on 2/2/2005 Dr. PETERSON continued plaintiff's dosage of Robaxin to 750 mg and ordered an x-ray of his cervical spine.

According to the x-ray plaintiff had mild degenerative disc disease. Notwithstanding, his soft tissue appeared normal. In March, 2005 plaintiff's dosage of Neurontin was increased to 800 mg.

On 4/20/2005 Dr. Kraft prescribed the plaintiff Ultram 200 mg, Darvon 260 mg with steady doses of Tylenol and Ibuprofen.

On 5/4/2005 Dr. PETERSON diagnosed plaintiff with mild degenerative disc disease, prescribed Neurontin, Tylenol and Ibuprofen.

On 5/5/2004 another x-ray was obtained showing normal prevertebral soft tissue and narrowing in disc spacing consistent with minimal Degenerative Disc Disease.

On 5/25/2005 I continued plaintiff's increased prescription of Neurontin 800 mg.

On 6/21/2005 plaintiff's prescription of Tylenol 500 mg and Robaxin 750 mg was continued.

On 8/1/2005 I increased plaintiff's pain medication to 800 mg of Neurontin. I continued his prescription of Robaxin and Ibuprofen.

On 10/24/05 I responded to plaintiff's sick call and increased his dosage of Neurontin to 900 mg.

On 11/9/2005 Dr. Howard evaluated plaintiff for complaints about neck pain, the plaintiff told him that Neurontin was working. Dr. Howard noted that plaintiff's pain was out of proportion to the physical findings of the MRI.

On 12/15/2005 Dr. WITWER evaluated plaintiff for his ongoing neck ache. He noted that plaintiff's complaint of pain was out of proportion and the findings of his MRI and x-ray showed minimal abnormalities. Dr. WITWER prescribed plaintiff Parafon Forte for relief of acute musculoskeletal abnormalities.

On 12/29/2005 Dr. Howard again evaluated Plaintiff's neck, he noted there was no tenderness, spasm, and that plaintiff was able to flex his neck. He again noted that plaintiff's complaint was out of proportion to his actual injury and findings of the MRI. Dr. Howard increased plaintiff's dose of Neurontin to 1000 mg.

On 1/23/2006 I evaluated plaintiff in response to a 602 appeal for medical care. I examined plaintiff's neck and noted that he had full movement on all aspects. He was able to take off his jacket, outer shirt, and long sleeve undershirt. I noted there was no tenderness or spasms and his reflexes were normal. I examined his medical records from January of 2005. I prescribed plaintiff Ultram and took him off Neurontin. Plaintiff said that Ultram brought his pain down to a 7/10 from a 10/10.

The findings of my 602 were consistent with the physical findings of other doctors, his x-rays, and his MRIs.

I did not falsify plaintiff's report. Everything I said in the report was my fair and accurate medical opinion.

It was the standard of care at all times relevant to this complaint to prescribe patients Neurontin, Ultram, Robaxin, Ibuprofen, and Tylenol for acute neck pain. We would start patients on a lower dosage and increase incrementally according to how well the patient responded to the medication.

It was not standard to start patients on Morphine and Methadone. Such drugs are highly addictive, dangerous, and often abused (this is especially true in prison). They are only prescribed when a patient has been diagnosed with a serious injury or as a last resort if a patient is unresponsive to other pain medications.

At no time relevant to this complaint did the patient exhibit symptoms of serious musculoskeletal injury warranting the continuous prescription of heavy narcotics or opiates. During his treatment by the medical staff at SCC, plaintiff was diagnosed with

9

>minimal Degenerative Disc Disease. The symptoms he was complaining of were out of proportion to his physical findings, MRI, and x-rays.
>
>At no time did I, or any of the treating doctors at SCC, intentionally ignore plaintiff's symptoms or complaints. At all times, we responded to his needs in compliance with the standard of care for treating neck and back pain.

(Thomatos Decl. ¶¶ 1-34).

Defendants also submit copies of relevant portions of Plaintiff's medical record. A review of Defendants' Exhibits 1-20 establishes that Plaintiff's complaints of acute neck and back pain were responded to with prescriptions of pain medication and that an x-ray was ordered which indicated lower cervical spondylosis. Defendants' Exhibit 3 establishes that Plaintiff disagreed with the course of treatment, and demanded another medication which was denied. Defendants' Exhibit 5 establishes that Plaintiff underwent an MRI of his cervical spine, which revealed that the alignment of his cervical spine was normal. Specifically, the MRI revealed "normal amounts of bone marrow with minimal and moderate narrowing." It also showed an absence of focal disc herniation. The resultant diagnosis was minimal Degenerative Disc Disease. (Id.)

As noted in Dr. Thomatos' declaration, another x-ray was ordered on May 4, 2004, and on May 10, 2004, Plaintiff was prescribed 600 mg of Neurontin and 750 mg of Robaxin. On November 23 and December 23, 2004, Plaintiff was prescribed Neurontin and Tylenol. During 2005, Plaintiff's dose of Neurontin increased incrementally from 600 mg to 1000 mg. On May 5, 2005, another x-ray was taken, showing normal prevertebral soft tissue and narrowing in disc spacing consistent with minimal Degenerative Disc Disease. Neurontin and Tylenol were continued. (Dfts' Exh. 7-17.)

On December 15, 2005, Dr. Witwer examined Plaintiff, noting that his complaint of pain was out of proportion to the findings of his MRI, which showed minimal abnormalities. Plaintiff was prescribed Parafon Forte 500 mg for relief of acute musculoskeletal conditions. Dr. Howard confirmed those findings on December 29, 2005. In response to Plaintiff's inmate grievance

10

regarding his medical care, Dr. Thomatos examined Plaintiff on January 23, 2006. Dr. Thomatos examined Plaintiff's neck and noted that he had "full movement on all aspects." Plaintiff was able to take off his jacket, outer shirt, and long sleeve undershirts. Dr. Thomatos noted that there was no tenderness or spasms and that Plaintiff's reflexes were normal. Dr. Thomatos took Plaintiff off of Neurontin and prescribed Ultram. (Dfts' Exh. 18-23.)

      The Court finds that Defendants have met their burden on summary judgment. Dr. Thomatos' declaration and Plaintiff's medical record clearly establish that Plaintiff was seen on numerous occasions for his neck pain, underwent diagnostic procedures, and was prescribed medication determined by many physicians to be medically appropriate for Plaintiff's condition. Defendants' evidence establishes the lack of existence of a triable issue of fact – the evidence establishes that Defendants were not aware of and were not deliberately indifferent to a serious medical need of Plaintiff's. The burden therefore shifts to Plaintiff to come forward with evidence of a triable issue of fact.

      Plaintiff's opposition consists of 38 pages of argument, along with 99 unenumerated pages of his medical record and a two page declaration.[2] Plaintiff's argument in opposition is not made under the penalty of perjury, and will therefore not be considered as evidence in opposition. Plaintiff contests Defendants' statements of undisputed facts, essentially arguing that they are not true. Plaintiff does not, however, direct the Court to any evidence in the record that supports his argument. Throughout his opposition, Plaintiff argues that "something else" was wrong with him, and that the medications prescribed were not effective. Plaintiff argues that surgery was "actually necessary," despite Defendant's opinions. Pages 1 through 4 of Plaintiff's

---

[2] The June 5, 2008, first amended complaint is signed under penalty of perjury. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987)(per curiam); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(c)(4). The Court will therefore consider the first amended complaint as an affidavit in opposition to the motion for summary judgment.

Exhibits indicate that Plaintiff underwent spinal surgery in July of 2010.  Plaintiff offers no evidence, however, that surgery was indicated in 2004 or 2005.  Page 4 of Plaintiff's Exhibits, dated July 14, 2010, establishes the following:

> CHIEF COMPLAINT: Degenerative disc disease, cervical spine, C5-6, C6-7, with right C-5, C-6, and C-7 radiculopathy.
>
> PRESENT SYMPTOMS: The present complaints are of continued pain on both sides of the neck, right greater than left, with pain from the base of the neck on the right radiating down the right arm and extending principally to the index, middle and ring fingers with weakness of grip, loss of strength in the arm, and unabated pain in the arm over the past six months.  Prior injections gave temporary relief, but did not give lasting relief, as reported on 4/22/2010.  He has not improved.  He does continue with arm pain, as well as mild difficulty with tandem walking in his gait.
>
> The patient has been followed since January 15, 2009, and has continued with unremitting pain in the same areas throughout without new injuries.
>
> PAST HISTORY
> Illnesses:  History of asthma.
> Injuries
> 1.  In 1974, he sustained an injury on a military ship when a crate landed on his right side and he developed acute pain in the right shoulder and down the right arm.  He was later discovered as having a biceps ruptured tendon which was repaired and this has continued asymptomatic.
> 2.  In 1981, he had an MVA when he hurt his low back.
> 3.  He had a fall in 2007 when a toilet lid hit is right hand.  This created a new onset of pain down the right arm.
> Operations:  In 1980, right biceps tendon repair, right shoulder, VA Hospital in Los Angeles, by Dr. Kay.

(Pltf.'s Exhibits, p. 12).

      Plaintiff's Exhibit 4 does not establish evidence that Defendants were deliberately indifferent to a serious medical need of Plaintiff's.  Exhibit 4 establishes that Plaintiff had spinal fusion surgery in 2010, and was suffering from, among other things, a new onset of pain that occurred from an accident in 2007.  There is no evidence in the surgical report that the treatment of Plaintiff from 2004 to 2006 constituted deliberate indifference.  The fact that Plaintiff had surgery four or five years after interacting with Defendants does not subject them to liability.

Plaintiff has offered no evidence that surgery was indicated in 2004, 2005 or 2006, or that Defendants were in any way deliberately indifferent to a serious medical need of Plaintiff's in 2004 or 2005.

Plaintiff also attaches the Director's Level Appeal Response regarding inmate grievance No. SCC 06-00054, the grievance challenging the care at issue in this lawsuit. The Director's Level response exhaustively catalogs Plaintiff's medical care, ultimately concluding that:

> It is important to note that inmates may not demand a particular medication, diagnostic evaluation, or course of treatment. In this case, the institution has established that clinicians are attentive to the appellant's medical needs and have pursued a reasonable evaluative course to determine the medical needs of the appellant. It is important to note that the California Code of Regulations, Title 15, Section (CCR) 3354 establishes that only qualified medical personnel shall be permitted to diagnose illness and prescribe medical treatment for inmates. It is not appropriate for the appellant to self-diagnose his medical problems and then expect a physician to implement the appellant's recommendation for a course of medical treatment. In this particular matter, the appellant's contention that he has not received adequate medical care is refuted by the medical records and professional staff familiar with the appellant's medical history.

(Pltf.'s Exhibits, p. 82). The Court has reviewed all of the medical records Plaintiff has submitted as exhibits in support of his opposition to summary judgment. Plaintiff's own evidence establishes that he received medical care for his condition. Although Plaintiff vehemently disagrees with the course of his treatment, that does not subject Defendants to liability under the Eighth Amendment. Plaintiff cannot prevail in a section 1983 action where only the quality of treatment is subject to dispute. Sanchez v. Vild, 891 F.2d 240 (9th Cir. 1989). Mere difference of opinion between a prisoner and prison medical staff as to appropriate medical care does not give rise to a section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

///
///

## V. **Conclusion and Recommendation**

The gravamen of Plaintiff's complaint is that Defendants failed to adequately address his medical needs. Defendants, in Plaintiff's opinion, failed to adequately treat his pain, and failed to surgically intervene. Plaintiff has not, however, come forward with any competent medical evidence to support his conclusion. Defendants have submitted evidence that establishes that the medical care received by Plaintiff was appropriate and within sound medical practice. Specifically, Defendants' evidence establishes that Plaintiff's contention that he was prescribed an appropriate pain medication was contradicted by the results of his MRI. Defendants submitted evidence that, in the view of medical professionals, surgery was not warranted. That Plaintiff underwent spinal surgery five years later does not establish deliberate indifference. Plaintiff must come forward with evidence that establishes, without dispute, that Defendants knew of and disregarded a serious medical condition of Plaintiff's. Plaintiff has failed to do so.

Accordingly, IT IS HEREBY RECOMMENDED that Defendants' motion for summary judgment be granted in favor of Defendants and against Plaintiff.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Tile 28 U.S.C. § 636(b)(1). Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time waives all objections to the judge's findings of fact. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998). Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1152 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **December 19, 2013**

**/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE